Our next case for argument is 22-1873, Cintec Company v. Chilisin Electronics Corp. Mr. Lamberson, please proceed. Good morning, Your Honors, and may it please the Court. The judgment of infringement entered by the District Court below should be reversed. Under either of the two claim constructions at issue here, either the District Court's construction or Chilisin's proposed construction, there has to be a causal relationship between the hardness difference in an accused product and the formation temperature. And Cintec's expert, Dr. Cole, was asked on cross-examination, how would you show that causal difference? And he said you would have to do that through experimentation. Cintec and its expert, however, did no such experimentation here. They tested two aspects of the accused products. What was the size of the particles in those products, and what was the hardness? What intrinsic evidence would you point us to to require that the hardness difference have more than an impact and must instead be like a but-for cause or something like that? Certainly. So it's throughout the intrinsic record. If we look at the 312 patent as an example. You can just give me your best one. What's that? You can just give me your best. You said it was throughout. You can just give me the best. Well, then I would probably start with the file history, which is at the end of the original file appendix, where it's clear that what they're purporting to claim here, the patent describes two different features that could potentially impact the formation temperature. What page of the prosecution history would you like us to look at? 17389. So you have two potential variables you could change according to this patent. And they, of course, chose to put only one of those variables into the claim. This is the very last page of the second volume of the appendix, right? Correct. Okay. And I should say in the supplemental appendix, there is a fuller version. This is the critical page, so that's why I pointed to this one. And what they're saying here to the patent office is that it is the hardness difference that you adjust. They use the word corrected. And that's what adjusts or corrects the temperature to get to this melting point below the melting point of the wire. And that's all there's to claim. So you're suggesting that nothing else can have an impact, or are you suggesting that this has to have a mean impact? I just want to make sure I understand what you're saying. Yes. Our proposed construction is what was proposed below at, for example, 2737 of the appendix, which is that you couldn't achieve this formation below the melting point without the hardness difference. So it is a causation. And this is also actually what Syntec said below as well. If you look at 4510 of the appendix, which is their opposition brief, they wrote the causal relationship. Well, I guess I'm struggling because what you just said seems consistent with what the district court construed. The hardness difference has to be part of the causation inquiry. But it doesn't have to be the exclusive causation inquiry. So what's wrong with that view? What's wrong with that view is that, well, there's two things wrong with that view. First of all, when we talk about causation, it is the idea that you can't achieve, the effect would not happen if not for the cause. That is what causation means. And the district court did say in its opinion at 7147 that these patents do teach a causal link. Where the district court erred was when it wrote the causal link is between hardness and a lower temperature. That is incorrect. What the claims actually say is that by means of the hardness difference, you form at a temperature below the melting point of the wire. So it is not simply that hardness impacts the temperature of formation in some way. The causation recited in this claim is in fact that the hardness is the cause of getting to this claimed result of being below a certain temperature. Now, could you then further reduce the temperature through other means, such as size? Certainly you could. But you would have to show for this particular claim the way it's drafted. Just to clarify, does the intrinsic record actually say the hardness difference must be the primary or but-for cause? The intrinsic record, for example, says that hardness is the... It says various things that are different in different places. So it does say that in this patent it is hardness that causes the results. So if we look, for example, at page 77 of the appendix, which is the 312 patent... Just give me column and line number, please. In column one, lines 54 through 58, it says that an objective of the present invention is to lower the temperature by using the hardness difference. So not by using the size difference. That is the objective here. Now, could you use size... Well, it's one of the objectives. It is one of the objectives. It is one of the objectives. So that doesn't say but-for-cause, though, right? Is there a part you're getting ready to point us to that relates to but-for-cause? The patent doesn't use the word but-for-cause. The problem with any other construction is you get into a realm, like we talked about in the brief, where even the smallest impact could be covered by the claim. But column two, lines 13 to 21, specifically discuss optimizing both the hardness difference and the size difference to lower the manufacturing temperature. Precisely they do, and the distinction here is that they chose to claim only hardness and not size, and so that has to have some meaning. Well, but this is a comprising claim, correct? It is. Yes. So it's definitely true that hardness has to impact temperature, right? That much we know for sure, but it doesn't mean that hardness can be the exclusive impact on temperature. And we would agree, but the claim doesn't say hardness. It does not say by means of hardness you reduce the temperature. That is not the claim. It does not say by means of hardness we have a reduction. It says by means of hardness we form at a temperature below the melting point of the insulation, below 300 degrees Celsius. That is what the claim requires. So if hardness just gets you some small reduction but is not what gets you below that melting point, then that limitation is not met. Okay. Do you want to move on to your validity argument? I do. I would like to move on to non-infringement because even if you were to affirm the distinction. I'd like you to move on to validity, please. Validity, yes. Okay. So for invalidity, our expert presented two different references, Schaefer and Nakamura. Schaefer disclosed a molded choke that had a wound wire and that had two magnetic powders and that met all of the – our expert said met all of the limitations of the claims. He did acknowledge that the size and hardness of the two powders in Schaefer were not expressly present. And for those properties of magnetic powders, he relied on a separate reference, Nakamura. Nakamura discloses an electronic device with two mixed powders. They do differ in size. They do differ in hardness. And they fall under – How do you respond to the argument that Nakamura has ranges and so because it has ranges of size and hardness, it doesn't expressly disclose the importance of having a first powder that's got larger, harder, and then the second powder is smaller and softer. And that is why it's an obvious misreference. And our expert said to him that teaches that they are – the ranges are not the same. One is higher than the other. And so you do have, you know, one powder generally being, you know, falling into a larger range than the other powder. And the patent here, when it uses average size, there was no particular, you know, magic in that phrase. It was simply conveying what the patent says, which is that you do have a size difference. But as both experts said below, these sizes, when we're talking about the size of a powder, it's not a single size. There's always a range. Are you suggesting that the reference teaches at least some instances in which that property or function is met in the claim? It teaches that as well as just simply the concept that the powders have differing ranges and therefore some have a larger size distribution than others. And so when we're talking about a difference in average size, it's simply teaching that it would have been obvious to have powders that were generally larger and powders that were generally smaller with an associated hardness difference. And so the district court really never addressed this particular combination in its JML order. What it said was simply that it couldn't find a size or a hardness difference in the shape of reference. But again, for obviousness, that was not the reference we were relying on for those size and hardness differences. So fundamentally, do you just want a jury to be able to pass on this particular question as opposed to what happened here with the district court? Is that the belief that you would be seeking? I'm sorry, say that again? Do you want a jury to pass on this obviousness question? Yes, absolutely. Okay. Thank you, Your Honor. I understand the court's guidance. I did just want to say I wanted to point to one piece of evidence in the record, and that was at 9847 of the appendix, the cross-examination of Dr. Cole. And he was asked, how would you determine the impact hardness would have on formation temperature under any construction? And he said he would have to do that through experimentation. So you're referring back to infringement. Did you want to talk about damages? I'm happy to do so. What assumptions do you think Mr. Van Uden made that you think were expected? So there's two sort of separate buckets these fall into. There's the importation percentages, which impact both lost profits and the royalty because both were applied to how many devices were imported. Why don't you focus on that one first? Absolutely. So, for example, if we just pick one example, which is Qualcomm. This is one of the companies that Mr. Van Uden spoke about. And the evidence he used to show their importation percentages is at page 4187 of the appendix. This is an excerpt from Qualcomm's 10-K filing. And he says this tells you how many devices were coming into the United States. But what the page actually says is that these revenue numbers do not reflect the country where the device is sold or used. Moreover, the page says that the revenue includes licensing revenue, for example, between Qualcomm and Apple, and that that licensing revenue is booked based on the location of the licensee. So the fact that Apple is in Cupertino will impact their sales and how much of it goes to the U.S. And, in fact, if you look at page- Which one are you looking at? I'm looking at 4187. 4187? Well, yeah, what are you specifically looking at there? Under revenues, non-reportable segments, what are you looking at? It's above the revenue numbers, Your Honor. We've got to be careful here. Yes, so above the paragraph, the revenue numbers show breakdowns by U.S. and the rest of the world for their entire revenue. And above that, in highlighting, and I see that I'm getting into my rebuttal time, but very briefly, it says that we report revenues. It says, as a result, the revenues by country presented herein are not necessarily indicative of either the country in which devices containing our products and or intellectual property are ultimately sold to consumers or the country in which the companies that sell devices are headquartered. So the question is not whether the 10-K is accurate. It's accurate insofar as what it reports. The question is the methodology. Should this particular number have been applied? And with that, Your Honor, I'd like to reserve the remainder of my time. Okay, it's fine. Thank you. Mr. Johnson, please proceed. Thank you, Your Honor, and may it please the Court, I'd like to begin with the by means of limitation because I think the Court's questions highlight the problem with Mr. Lamberson's interpretation. There are three textual signals in this limitation that tell you, without even looking for the specification, that the hardness difference simply means to make a contribution to the lower formation temperature. They include the following, the fact that there's no need. Okay, why don't you move on to validity? Okay, Your Honor, happy to. The two references at issue here, Schaefer and Nakamura, would not guide an ordinarily skilled artisan to learn anything. They don't suggest anything about the relationship between size and hardness. Let me start with the point about ranges. There is some overlap in the ranges of Nakamura, but within those ranges, the two particles at issue could have the opposite relationship of size and hardness that is claimed by syntax X. But what about the fact that your claim, it doesn't itself have a range. It's not like you're trying to look at a range in the prior art and apply it to a new range that you've claimed. Instead, you have a particular relationship that you've claimed that in many circumstances, the majority of the circumstances, Nakamura will disclose. In some circumstances, the range is there. There's at least some instances, Nakamura, where they will satisfy having larger, harder particles, and then, I guess, smaller, softer particles, right? But there's quite a number of inferences that you have to make to get to the point where you get the right combination, and this Court's teaching in cases like Genentech and Sinvina tell you that there's no presumption of a prima facie case of obviousness where there's something unique within the range. Here, the special and critical subset of the range is the situation where the larger particles are the harder particles and the smaller ones are softer. The range includes the opposite, and nothing in the patent either guides you to particular points in the range or even suggests the problem. Well, I think that the problem I have with your argument is that the Court did this on Jamal, and the jury didn't get to decide it. I mean, you may be exactly right, and the jury may accept everything you're saying, but these sound like when you say there are a number of inferences you'd have to accept, that's exactly, at Jamal, what you have to do is you have to accept all the inferences in favor of the other side, and so if we accept all those inferences, I just don't see how Jamal was proper here. Well, and the reason, I think, is that you have to look at the cross-examination of Dr. Brodman, and it was after that cross-examination of Dr. Brodman that Jamal was granted. But again, that goes to a fact-finding, and by the way, the tribunal below didn't explain any of that. You're trying to tell me that this was the rationale upon which the trial court decided to grant Jamal, but the trial court didn't say any of that. The trial court didn't go through Dr. Brodman's testimony at all, really. So the question on appeal under Rule 50 is whether any reasonable jury could conclude that these patents are obvious, and if you look at what Dr. Brodman admitted, and again, Jamal was granted immediately after that. These are a number of the things he admits. He admits that Nakamura uses the same forming and curating steps as in the prior art. He admits that the only discussion of heat treatment in Nakamura was not to relieve strain caused by molding pressure, that it's simply about weighing the materials. He admits that there's no discussion in Nakamura of the strain-related problems that Syntex solves. There's no reason to combine. Nakamura is just one reference of the two combined references, correct? Well, right, Your Honor, but Schaefer doesn't even discuss size or hardness. But it does give two examples that the jury could have then heard expert testimony about. But in the two examples, it was admitted on cross, again, by Dr. Brodman, that the anchor core steel could be softer than the carbonyl iron. And there's nothing, nothing about size in Schaefer. So the central insight of the patent, that the larger particle needs to be the harder particle, Schaefer doesn't even get you to first base. Wasn't there some testimony also about the knowledge of one of Ordinaire's film work generally outside of these two patents that the jury could have heard? Your Honor, the other references didn't relate to molding chokes, and none of them discussed high temperature annealing. Offhand, I don't recall any more specifics than that. But none of these patents are dealing with the problem that Syntex was solving. And so you have a situation where nothing in the references guides you to the right relationship. And if they don't tell you the problem that you need to solve, I mean, how could you have a reasonable expectation of success in solving it when you read these references? Didn't Syntex expert Dr. Cole explain how the differences in hardness values impact the formation of temperature of chokes? I mean, wasn't there some testimony? That's the kind of testimony I'm talking about. He absolutely talked about how the difference in hardness temperatures affect formation temperature, and of course that's the infringement issue. And on that point, by the way, I would note that in response to Mr. Lamberson's point about experiments, Dr. Cole specifically walked through how their products use the preferred embodiment and track the experiments in the patents. So although he did not test Chilison's products, he very carefully walked through how the experiments in the patents tell you what you need to know about testing. Did your expert ever tie his damages analysis to infringing products at some point? Absolutely, and I want to walk through the methodology on this here because it has been, I think, unfairly portrayed. This was Mr. Van Uden's methodology. He started with Chilison's own customer's sales data. He identified the products, infringing products, that were sold abroad for end use in U.S. consumer electronics. So he's starting with infringing sales. Now, he has to make assumptions, though, in order to determine, because those were sales outside the United States. So where the assumptions come in is where he has to calculate the amount of imports, the amount of products that went back into the United States, right? That's correct, Your Honor. He questions whether they're reasonable. Yes, and he made conservative assumption after conservative assumption to make sure that he was not overstating the damages. Can I ask you this? Was it fair where there's a multi-party market for him to assume that, for example, a company like Apple bought their chokes only from Chilison? So, first of all, the testimony in this case was that it was conservative to look at this as a multi-party market because in most situations it was a two-supplier scenario. So he took a market share approach as a conservative way of saying, okay, that's not always the case, but often it is. But did he take a market share approach in determining the percentage of imports? That's what I'm asking. He's talking about a market share approach later when he's calculating lost profits. So I didn't get far enough into the methodology. If I may, I think it would be helpful for me to walk through exactly what he did. So he starts with Chilison's own customers' actual sale numbers. He analyzed the sales to these companies. He broke them down into situations where there are design code requirements, i.e. where Chilison itself tracks the type of product specifications and who it's ultimately going to. Then, and this is where it starts to get into determining the import percentages, he looked at 10Ks, which of course are sworn statements to the government. He looked at audited financials, and he looked at third-party data to break down the sales by geographic region. Now, he used the Gardner data, which is private, reliable data that Chilison's own expert admitted he relied on himself, and the company itself relies on, to corroborate the 10K percentages. Just out of curiosity, was the data for each customer? Yes, the Gardner data is… Third-party data? The third-party data, where it existed, is for each customer, and it covered… He said where it existed, but that means it's not for each customer. It didn't exist for each customer. I'm trying to explain, Your Honor. There were six customers for which it existed. It was more than half of the products at issue. Apple alone was 40%. Now, here's why… They're speaking lost profits from 27 customers, right? So you had data from six. What about the other 21? We did not have Gardner data from the other 21, but if you compare the 10K numbers with the Gardner numbers, you see that they are within 3 to 5 percentage points in all cases except one, and in the one case where it was greater, he used the lower percentage. Did you ever try to do any discovery to get some additional data beyond the Gardner data? So, Your Honor, if you're saying we should have subpoenaed additional information, Chilicent provided its actual sales number after discovery closed, and, of course, the foreign companies were beyond the subpoena power of the court. This court's cases teach that when you… I just want to answer my question, okay? Did you ever do discovery to get some additional data beyond the Gardner data? Yes, no, maybe so. Yes, we got actual sales numbers from Chilicent, Your Honor. I'm sorry, I misunderstood. Yes, no, so… She asked about third-party sales numbers. Chilicent is not a third party. I'm sorry, I must have misunderstood your question, Your Honor. Okay, I'll give it another go. Okay, so we've talked about the fact there are all these different customers. Did you ever go get some additional discovery from other customers beyond, I believe, was six that we've talked about that were in the Gardner data? Right, so that's what I was saying. We did not subpoena them, Your Honor, because Chilicent provided its actual sales data to us, which elucidated who their customers were after the close of discovery, and, of course, the overseas companies would be beyond the subpoena power of the court. The third-party data comes from a market research, a very reputable market research firm called Gardner. It admittedly did not exist for all 27 companies, but it was for a majority of the sales, and wherever Mr. Van Uden did not have reliable third-party data, he simply excluded the company. Can I ask you another question? Absolutely, Your Honor. Okay, so we have read the expert report and the testimony provided to us, but one question I have that wasn't clear to me is I saw, for example, on Apple's 10K, the amount of revenue that they had in the United States would include things that would not have a choke in it, and so how did he deal with it? Your Honor, that's why you have to remember where this data begins. Mr. Van Uden began with actual numbers of infringing choke sales, and then he said let's narrow down to what came in the United States. Yes, I understand, but he multiplied that by an import percentage that includes percentages off if it doesn't include choke products. Correct, and the Gardner data are specific to product categories. They're specific to categories of products that contain chokes. It's not an exact science. What evidence was there that he relied on to determine whether for those particular customers other chokes were provided by other customers, or was there an assumption that a company like Apple gets all its chokes from one company? Your Honor, nothing in this court's precedents teach that you have to have. I just want to ask right now, and then you can tell me. I understand and I think that what I'm asking doesn't matter, but I'm trying to figure out just the facts right now, and then I'll think about the law. Could you help me with that one factual question I just asked you? So the Apple data were specific to categories of products, the Gardner data. They're not down to the jot and tittle of every particular type of product, but they are specific to product categories, and the district court acknowledges this in her opinion. I don't think that answers my question.  How do they account for the fact that there might be dual suppliers of chokes for any of these 27 customers? Well, Your Honor, if there are dual suppliers and it's a two-supplier market as often as a course, the fact that they're copying the products and making infringing sales means you would get it. So I guess my point is this. You're saying that in order to determine how many products were imported into the United States, they looked at all of the revenue from the products that could have chokes for each of those 27 companies, and my question is then how do you know that those chokes were all provided by the accused infringer in this case? Well, again, this was not a case of backing into the damages number by starting from revenue. It was a case of starting from infringing sales and applying a percentage to it. Okay. If there are no further questions, we urge the court to affirm. Okay, thank you. Mr. Lamberson, do you have something to follow up on? On the Gardner data, Your Honors, first of all, we have no idea which phones or computers or tablets in this record contain accused chokes. It's simply not there. And when we look at it, we do have some statements in the record about, well, you know, we were both trying to sell to Apple, to their phones, phones generally, not specific models, or to Microsoft Xbox, for example. But there's no discovery, no information about which ones actually contain the chokes, which were imported in what volumes, and even the Gardner data, which is in the appendix at 15759. And when we look at Microsoft, it talks about phone and UMT. We don't know in the record what UMT includes. None of these seem to relate to Xbox gaming consoles, for example. Your opposing counsel seemed to imply that some information that they got from you would enlighten us more about what was going on with the 27 customers. Can you just briefly address that? Certainly. It's not the case. I mean, there's nothing in the record that suggests Chilison knows where the end products go or what chokes go into them. You know, Chilison very frequently sells chokes to what are called OEMs or ODMs, companies like Foxconn. And they will then stick it into some other subassembly, which gets put into something else, which eventually perhaps gets put into a phone. But Chilison itself is simply supplying chokes to Foxconn. It doesn't know which specific phones those go into, and, you know, Foxconn could take, you know, one choke that was going into one phone and put it in another phone or another device, and Chilison simply wouldn't know that. If there was evidence that Chilison had more information, that could have been addressed at the district court by filing motions, by asking for more discovery. It certainly could have been addressed through third-party discovery. I don't agree at all that, you know, third parties are out there. I mean, Apple. Apple is in the United States. Could they not have subpoenaed Apple? They could have certainly. Thank you, Your Honor. Okay. Thank you both counsel. This case is taken under submission.